Robert B. Sykes (#3180)
Alyson C. McAllister (#9886)
SYKES McALLISTER LAW OFFICES, PLLC
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone (801) 533-0222
bob@sykesmcallisterlaw.com
alyson@sykesmcallisterlaw.com
*Attorneys for Plaintiffss*

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| ROBERT WHITTLE and ANNIE ESPOSITO, parents and proposed personal representatives of JASON WHITTLE, deceased, on behalf of the estate of JASON WHITTLE, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>DARRELL BROADHEAD, an Officer of the Riverton Precinct of Unified Police Department, JASON ADAMSON, Former Chief of Police Services for the Riverton Precinct of Unified Police Department, UNIFIED POLICE DEPARTMENT, a police department operated under the authority of Salt Lake County, SHERIFF ROSIE RIVERA, Sheriff of Salt Lake County, and JOHN and JANE DOES 1-10,<br><br>Defendants. | Case No. 2:20-CV-_____<br><br><br>**COMPLAINT<br>AND<br>JURY DEMAND** |

Plaintiffs Robert Whittle and Annie Esposito, by and through the undersigned counsel of record, hereby complain against the above-listed Defendants, as follows:

## PRELIMINARY STATEMENT

The following allegations are based upon the undersigned's understanding of information presently available. This is a civil rights action in which Plaintiffs seek relief for the Defendants' violations of the rights of Jason Whittle, guaranteed by the United States Constitution, specifically, the Fourth and/or the Fourteenth Amendments, which rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. §1983 and §1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Section 14, to the extent applicable under the facts.

On October 22, 2018, Defendant Broadbent shot and killed Jason Whittle in his mother's front yard. Jason and his mother, Annie Esposito, had called 911 for help, as Jason was experiencing a mental health episode that his mother was unable to deal with. Jason was shot in the head and killed within 30 seconds of exiting Annie's home at the request of the police. Jason was one of five people shot and killed by Unified Police Officers in 2018, which was the most of any law enforcement agency in Utah in 2018 (a year of a record high of nineteen fatal shootings). None of the UPD shootings resulted in charges. Defendant Broadbent improperly used deadly force, in violation of Jason's rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Utah Constitution.

## PARTIES

1. Plaintiff Robert Whittle ("Robert") is a citizen of the United States and a resident of Los Alamos County, State of New Mexico. Robert is the natural father and heir of Jason Whittle, who is deceased, and brings this action on behalf of the heirs and estate of Jason Whittle

(hereafter "Jason"). Robert also files this action as one of the "proposed personal representatives of Jason Whittle."

2. Plaintiff Annie Esposito ("Annie") is a citizen of the United States and a resident of Salt Lake County, State of Utah. Annie is the natural mother and heir of Jason Whittle, who is deceased, and brings this action on behalf of the heirs and estate of Jason Whittle (hereafter "Jason"). Annie also files this action as a "proposed personal representative of Jason Whittle."

3. At the time of his death, Jason was a citizen of the United States, and a a resident of Salt Lake County, State of Utah.

4. Defendant Darrell Broadhead ("Broadhead") was, at all relevant times, a police officer with the Unified Police Department ("UPD"), which is a department of Salt Lake County (the "County"). Defendant Broadhead is sued in his individual and official capacities.

5. Defendant Jason Adamson ("Adamson") was the Chief of Police Services for the Riverton Precinct of UPD at the time of the incident alleged herein and was acting within the course and scope of his employment. Defendant Adamson's authority to act was derived from Utah State law and therefore he is a person liable under 42 U.S.C. §1983. He is responsible for supervision, hiring, and training of officers in his precinct of the UPD. As a supervisor, Defendant Adamson has control over UPD employees of the Riverton Precinct. Defendant Adamson is sued in his official capacity.

6. Defendant Unified Police Department ("UPD"), including all of its divisions, is operated under the authorization of the County, and is located in the County, with day to day operations under the authority of the Salt Lake County Sheriff. Deputy Sheriffs and other officers and employees of UPD act under the direct supervision of their Precinct Chief and the

County Sherriff. UPD's policies, procedures, and training directly caused the Plaintiffs' harm, justifying an award of damages.

7.     Defendant Sheriff Rosie Rivera ("Rivera") is the Sheriff of the County, acting within the course and scope of her employment. Defendant Rivera's authority to act was derived from Utah State law and therefore she is a person liable under 42 U.S.C. §1983. She is responsible for creating and enforcing the rules and policies for the County, and specifically for UPD. As a supervisor, Defendant Rivera has control over County employees who are associated with UPD. Defendant Rivera is sued in her official capacity.

8.     At all relevant times, Defendant John and Jane Does 1-10 ("Doe Officers") were other officers or agents employed by UPD. At all times alleged in this Complaint, Doe Officers were acting within the course and scope of their employment. Plaintiffs are also suing the Doe Officers in their official capacity.

## JURISDICTION AND VENUE

9.     This action arises under the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983. Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. The Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. §1367.

10.    The claims made in this Complaint occurred and arose in Salt Lake County, State of Utah. Accordingly, venue is proper under 28 U.S.C. §1391.

## GENERAL ALLEGATIONS

11.    In the early hours of October 22, 2018, Jason went to see his mother, Annie Esposito, at her home, after having been mugged by a few individuals while living on the street.

4

### Jason's History

12.     Jason had a history of substance abuse and had been previously diagnosed with depression, bi-polar disorder, and schizophrenia.

13.     Due to his mental illness, Jason would sometimes present signs of Schizoaffective disorder and paranoia.

14.     In the past, when Jason presented with these symptoms, or was in a similar mental state as he was on October 22, 2018, he would call the police and officers would escort him to the hospital.

15.     During the most recent interaction before this incident, police responded to Annie's 911 call with a social worker, offering help for Jason.

16.     Prior to this incident, Jason had been on the streets for a few months and had come to realize he was not able to take care of himself. He recognized he needed help and went to his mom to call the police to help (as they had in the past).

### Jason's Appearance/Deportment

17.     At the time of his death, Jason was 26 years of age, and was tall and thin after a few months of living on the streets.

18.     At the time of the incident, Jason was awaiting the officers at his mom's home in Riverton, Utah.

19.     After relaying their information to dispatch, Jason and Annie were waiting on the back patio for the police to arrive. Jason was holding his small dog in his arms.

20.     Jason was also still holding a butter knife that he had been using to butter toast during the 911 call.

21. Annie told the dispatcher that Jason had a butter knife and that he was not in a proper mental state because of his schizophrenia. However, she repeatedly told the dispatcher she was in no danger from Jason.

**911 Call**

22. As they had multiple times before, Annie called 911 for assistance with Jason that morning.

23. Jason quickly grew frustrated with the dispatcher after having repeatedly given his address and other information while in a panicked and paranoid state.

24. Annie's neighbor's son, N.L. reported that he overheard Annie's conversation with dispatch that morning.

25. N.L. also called the police and informed them that SWAT was not necessary and that police should conduct a welfare check when they arrived.

26. Instead the dispatcher told officers they were responding to a bipolar/schizophrenic male with a knife in his hand.

**Police Ambush**

27. At approximately 6:50 a.m., Defendant Broadhead, who was being assisted by Officer Yates, arrived at Jason's home.

28. Yates later stated that they had decided to utilize their handguns rather than a taser given what they were told about the suspect's condition and the situation.

29. When he arrived at the scene Defendant Broadhead had dispatch instruct Jason and Annie to come out to the front of the house, where they were essentially ambushed by a show of police force.

30. As they came around to the front of the house, the police turned bright lights on them, which along with the flashing police car lights and officers with guns drawn scared Jason into reacting by dropping his dog and grabbing his mother.

31. Broadhead immediately pointed his gun at Jason, while also yelling something that was not comprehensible by Jason or Annie.

32. Feeling scared and paranoid, Jason first held the butter knife against Annie's throat but then moved the knife away from her when officers yelled at Jason to put the knife down.

33. According to the neighbor's witness statement, he heard Annie yelling not to shoot, that Jason was mentally ill, and that he only had a butter knife.

– **No Immediate Threat of Harm** –

34. At no time was any officer in immediate danger of death or serious bodily injury.

35. At no time was any citizen in immediate danger of death or serious bodily injury.

36. As Defendant Broadhead pulled up, Jason was coming outside while holding his dog, with no intention to harm anyone or escalate any situation.

37. Jason took no aggressive action until he was ambushed by Broadhead after complying with instructions to come out front and to drop his knife.

38. Within about thirty seconds of the start of the encounter, Defendant Broadhead approached Jason and Annie until he was about fifteen feet away, when he shot his gun, shooting and killing Jason instantly.

39. The butter knife was later found underneath Jason's back on the ground, proving that Jason had dropped the knife in compliance with officers' instructions before he was shot and killed by Defendant Broadhead.

### No Threats of Arrest or Other Warnings

40. Defendant Broadhead drew his handgun before Jason was even within view.

41. Defendant Broadhead did not issue any warning to Jason to "stop or I'll shoot" before firing his deadly execution-style shot.

42. None of the officers told Jason at any time he was "under arrest."

### Non-Lethal Options

43. Defendant Broadhead had available nonlethal methods of force, including a taser.

44. Officer Yates stated that he and Defendant Broadhead considered the use of a Taser but decided before they got out that utilizing a gun would be a better option.

45. Defendant Broadhead did not fire a warning shot.

46. While Defendant Broadhead yelled to Jason multiple times to put down the knife, at no time did he warn Jason that he would shoot.

47. Before Defendant Broadhead fired the shot, he was told multiple times by Annie that Jason would not hurt her, and that he only had a butter knife.

48. Before Defendant Broadhead fired the shot, he knew that another officer was nearby and could be of assistance.

49. Before Defendant Broadhead fired the shot, Jason had complied with his instructions to put down the knife.

### Improper and Questionable Investigation

50. As part of the protocol for investigating an officer-involved shooting, the Salt Lake County Attorney's Office detached an investigator to the scene after the shooting.

51. Defendant Broadhead declined to answer questions or provide a statement to the investigator, and never authored a report of the incident.

52. All other officers at the scene were interviewed by the investigators on October 22, 2018, the day of the shooting.

### Miscellaneous Facts

53. Allegedly the officers did not have body cam at the time of the shooting, despite having bodycams available, and despite the policy for this type of encounter.

54. Defendant Broadhead did not use situation management or de-escalation tactics.

55. Defendant Broadhead was not disciplined in connection with this incident.

### Tragic Consequences and Damages

56. On October 22, 2018, Jason was killed instantly after Defendant Broadhead shot him in the head, execution style.

57. Detective Broadhead put Annie, a completely innocent civilian, in extreme danger by firing a shot within inches of her head.

58. As a result, Annie has suffered immensely. She suffers every day and has been diagnosed from PTSD. It is debilitating, and most days she can hardly get out of bed.

59. In addition to any other damages, the Estate of Jason Whittle is entitled to pain and suffering and general and other damages as may be allowed by law, in an amount that is reasonable as determined by a jury.

60. Jason was much beloved by his mother, Annie Esposito, and his father, Robert Whittle. They are entitled to judgment in an amount to compensate for loss of society and companionship that is reasonable as determined by a jury.

61. Further, the Estate of Jason Whittle and Plaintiffs are entitled to all damages allowed under *Berry v. City of Muskogee*, Okl., 900 F.2d 1489 (10th Cir. 1990), which references are incorporated herein by reference.

## Other Fatal Shootings

62. In 2018 Utah hit a new record high of nineteen fatal shootings by officers.

63. UPD was responsible for five of the nineteen fatal shootings, the most of any department.

64. This pattern inspired Attorney General Sean Reyes to conduct an in-depth study and investigation into these shootings.

65. The focus of this investigation was to be on how officers are trained and the policies and procedures the departments are using regarding lethal force, as well as the role mental health issues play in these shootings.

66. Upon information and belief, as a result of this and other incidents with the UPD, the city of Riverton actually left UPD and reformed their own city police force

## FIRST CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant Broadhead*

67. Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

68. At all times relevant hereto, and in performance of the acts set forth herein, Defendant Broadhead acted under color of state law.

69. At all times relevant hereto, and in performance of the acts set forth herein, Defendant Broadhead actively and personally caused the violations of constitutional rights alleged herein.

70. The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. Tennessee v. Garner, 471 U.S. 1, 7-8, 105 S. Ct. 1694, 1701 (1985).

71. If deadly force is used, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

72. UPD training materials and actual training warned or should have warned Defendant Broadhead that deadly force may only be used where there is an immediate threat of serious bodily injury or death to the officer or others. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11.

11

73. Defendant Broadhead's conduct alleged herein, including his use of unreasonable or unnecessary deadly force by shooting Jason in the head, subjected Jason to the deprivation of his rights protected under the Fourth Amendment to the United States Constitution.

74. If, under the facts, Jason is not deemed to have been "seized" under the *Graham* factors relating to the Fourth Amendment, and not deemed to be in custody, then Defendant Broadhead's actions deprived Jason of life, liberty, and bodily integrity, as substantively guaranteed to Jason under the Fifth and Fourteenth Amendments.

75. The unreasonable, excessive, and dangerous deadly force used by Defendant Broadhead, which directly caused Jason's death as described above, deprived him of a liberty interest without due process of law, in violation of the Fifth and/or Fourteenth Amendments of the U.S. Constitution.

76. Defendant Broadhead's actions violated Jason's clearly established constitutional rights of which reasonable police officers are or should be aware.

77. Defendant Broadhead's actions proximately caused pain and emotional distress to Jason.

78. Defendant Broadhead's actions proximately caused Jason's death and the harm alleged by Plaintiffs.

79. As a result of Defendant Broadhead's unlawful actions, and to remedy misconduct of significant importance to the public, Plaintiffs had to retain counsel.

80. Defendant Broadhead's actions manifested malicious, reckless, and callous indifference to the rights and the very life of Jason Whittle.

## SECOND CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendants UPD, Rivera, and Adamson*

81.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

82.    The actions of Defendant Broadhead toward Jason Whittle were pursuant to, and consistent with, an established policy, practice, or custom of Defendants UPD and Salt Lake County.

83.    The actions of Defendant Broadhead were pursuant to UPD/County policy, practice, and/or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less-lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use.

84.    Defendants UPD, Adamson, and Rivera were deliberately indifferent toward the proper training, arming, and supervision of these officers.

85.    Their actions were the proximate cause of pain and suffering to Jason, the death of Jason, and the other damages sustained by Plaintiffs.

86.    As a result of these Defendants' actions, and in order to remedy this important issue of public concern, Plaintiffs had to retain legal counsel.

## THIRD CLAIM FOR RELIEF

*Unlawful and Deficient Policies, Procedures, and/or Protocols*
*Against Defendants UPD, Rivera, and Adamson*

87.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

88. Prior to the events on October 22, 2018, as set forth above, UPD made a decision to ensure that all officers had a body camera while on duty.

89. UPD had an ongoing obligation to train and monitor Defendant Broadhead as to how to interact with non-compliant or disorderly individuals without resorting to deadly force.

90. Defendant Broadhead knew of Jason's mental state of Jason and was aware he would need some sort of mental illness assistance.

91. Further, UPD officers have a duty to take the reasonable time to assess the lethality of the particular weapon, in this case of the particular knife, at an assumed victim's throat when the victim herself was yelling that the weapon was a butter knife and he was not going to hurt her.

92. UPD, Adamson, and Rivera had a duty to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies and procedures and/or protocols on the use of force, particularly the use of deadly force, with respect to any citizen, including a citizen who presented a risk of immediate serious bodily injury or death to the security officers.

93. UPD, Adamson, and Rivera failed to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies and procedures, and/or protocols regarding the use of force with a firearm, specifically about when such force is permitted by law, and when it is not permitted.

94. UPD, Adamson, and Rivera's failure to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies and procedures, and/or protocols pertaining to the use of deadly force demonstrated a deliberate and reckless indifference to the

safety, health, well-being, and the very lives of residents of Salt Lake County, and in particular, the life safety, and well-being of Jason.

95. UPD, Adamson, and Rivera's failure to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies and procedures, and/or protocols pertaining to the use of deadly force with a firearm proximately caused Jason's death, in that said Defendants unlawful, deficient, or non-existent policies proximately resulted in Defendant Broadhead using unnecessary, excessive, and dangerous force against Jason, directly causing his injury and death.

96. Plaintiffs demand judgment against these Defendants for compensatory damages, for costs and attorney fees, and for such other relief as this Court deems just and proper, and as may be allowed by law.

## COMPLIANCE WITH GOVERNMENTAL IMMUNITY ACT OF UTAH

97. Plaintiffs' constitutional claims are not subject to the provisions of the Utah Governmental Immunity Act, Utah Code Ann. § 63G-7-101, et seq., and therefore no Notice of Claim is required.

98. Plaintiffs are entitled to damages as set forth herein.

## JURY DEMAND

Plaintiffs hereby demand trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1. For a declaration and judgment that the actions of Defendant Broadhead, as well as Defendants UPD, Adamson, and Rivera's policies and customs regarding the use of lethal force, are and were unconstitutional;

2. For all other equitable relief deemed just and appropriate by the Court, including an order (a) requiring UPD officers to be equipped with and utilize body cameras and vehicle dash cameras while on patrol, (b) requiring UPD's law enforcement officers to carry non-lethal as well as lethal weapons while on patrol, but to prioritize use of non-lethal weapons, (c) to provide and require annual training regarding the use of non-lethal as well as lethal force, and (d) to implement regular training, at least quarterly, on the management of situations such as occurred with Jason in response to mental health calls, so as to meet federal and state constitutional requirements.

3. For damages for wrongful death due to the unconstitutional conduct. This includes all economic damages as well all appropriate pain and suffering damages, and damages available under federal common law, as per *Berry v. City of Muskogee, supra.*

4. For attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988, Utah law, and equity, to the full extent provided under applicable law;

5. For pre-judgment and post-judgment interest as provided under applicable law.

DATED this 21st day of October 2020.

**SYKES McALLISTER LAW OFFICES, PLLC**

 /s/ Alyson C. McAllister
ALYSON C. McALLISTER
*Attorney for Plaintiffs*