ANDREW M. MORSE (4498)
SCOTT YOUNG (10695)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah  84145-5000
Telephone:  (801) 521-9000
Facsimile:   (801) 363-0400
*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

---

| | |
|---|---|
| ROBERT WHITTLE and ANNIE ESPOSITO, personal representatives of JASON WHITTLE, and on behalf of the estate of JASON WHITTLE, | **DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| Plaintiffs, | Case No. 2:20CV728 |
| vs. | Judge Howard Nielsen |
| DARRELL BROADHEAD, JASON ADAMSON, ROSIE RIVERA, UNIFIED POLICE DEPARTMENT OF GREATER SALT LAKE, AND JOHN AND JANE DOES 1-10 | **(ORAL ARGUMENT REQUESTED)** |
| Defendant. | |

---

## RELIEF REQUESTED AND GROUNDS

Defendants Darrell Broadhead, Jason Adamson, Rosie Rivera, and the Unified Police

Department of Greater Salt Lake ("UPD") (collectively "Defendants") request that the Court enter

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Plaintiffs have pled claims for

excessive force under the Fourth Amendment, supervisory liability, and unconstitutional policies.

On October 22, 2018, UPD Officer Broadhead shot and killed Mr. Whittle because he was holding his mother hostage with a knife to her throat, and he had threatened to kill her and refused repeated orders to drop his weapon. This situation was much more threatening than that in *Kisela v. Hughes*, 138 S.Ct. 1148 (April 2, 2018), in which the Supreme Court held that an officer who used deadly force on a suspect with a knife who was 6 feet from the nearest person was entitled to qualified immunity. Under this precedent, Officer Broadhead is entitled to qualified immunity for using deadly force to stop Mr. Whittle. Officer Adamson and Sheriff Rivera are entitled to qualified immunity under *Serna v. Colorado Department of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006) because they were not personally involved in the incident. UPD is entitled to judgment on the pleadings because no constitutional violation was caused by a UPD policy or custom under *Monell* and its progeny. For these reasons, and others set forth below, judgment on the pleadings should be granted.

## STATEMENT OF FACTS

1.      "In the early hours of October 22, 2018, Jason [Whittle] went to see his mother, Annie Esposito, at her home." Complaint, Dkt. #2, Par. 11.

2.      "Jason had a history of substance abuse and had been previously diagnosed with depression, bi-polar disorder, and schizophrenia." *Id.*, Par. 12.

3.      Ms. Esposito "called 911 for help, as Jason was experiencing a mental health episode that his mother was unable to deal with." *Id.*, Preliminary Statement, p. 2.

4.      "Annie told the dispatcher that Jason had a butter knife and that he was not in a proper mental state because of his schizophrenia." *Id.*, Par. 21.

5.      "[T]he dispatcher told officers they were responding to a bipolar/schizophrenic male with a knife in his hand." *Id.*, Par. 26.

6.      "At approximately 6:50 a.m., Defendant Broadhead, who was being assisted by Officer Yates, arrived at Jason's home." *Id.*, Par. 27.

7.      "As they came around to the front of the house, the police turned bright lights on them, which along with the flashing police car lights and officers with guns drawn scared Jason into reacting by dropping his dog and grabbing his mother." *Id.*, Par. 30.

8.      "Broadhead immediately pointed his gun at Jason, while also yelling something that was not comprehensible by Jason or Annie." *Id.*, Par. 31.

9.      "Feeling scared and paranoid, Jason first held the butter knife against Annie's throat but then moved the knife away from her when officers yelled at Jason to put the knife down." *Id.*, at 33.

10.      Plaintiffs reference the Salt Lake County District Attorney's Office investigation in Paragraphs 50-52 of their Complaint; however, they did not attach the District Attorney's Officer Involved Critical Incident Report ("OICI") to their Complaint.  A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6).  *See Ramirez v. Dept. of Corrections, Colo.*, 222 F.3d 1238, 1240 (10th Cir. 2000).  "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."  *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (citations omitted).   The OICI is referenced in the complaint and it is central to Plaintiffs' claims, as it contains an interview with Ms. Esposito and other witness interviews regarding the underlying events.  Therefore, the Court is allowed to consider the OICI.  The Court is also allowed to consider the OICI because it is a matter of public record.  *See Van Woudenberg v.*

*Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by* *McGregor v. Gibson,*

248 F.3d 946, 955 (10th Cir. 2001) ("[T]he court is permitted to take judicial notice of its own

files and records, as well as facts which are a matter of public record."). The OICI is found on

the Salt Lake County District Attorney's website at

https://slco.org/contentassets/061d56504e33453a8daf73ed866636e7/10.22.18-oici-letter.pdf. It

is also attached hereto as Exhibit A.

11. Ms. Esposito described the encounter to the Salt Lake County investigators as

follows:

> The 911 dispatcher told Ms. Esposito to walk outside when the police
> arrived. Eventually, Ms. Esposito said she exited the house and Mr. Whittle
> followed her. Ms. Esposito explained that <u>when Mr. Whittle saw the police
> officers, he grabbed onto her.</u> **The officers told Mr. Whittle to stop, and Mr.
> Whittle replied: "I can hurt her! I can hurt her!" Ms. Esposito said that Mr.
> Whittle was holding her from behind and had a butter knife in his hand.** Ms.
> Esposito said she told the police officers that Mr. Whittle had never hurt her before.
> Ms. Esposito said when she saw the officers draw their weapons, she said: "Don't
> do this. He is just mentally ill."
> **Ms. Esposito explained that the officers kept telling Mr. Whittle to put
> down the knife, but Mr. Whittle would not comply.** Ms. Esposito stated that
> soon after, she saw a blinding light and an officer shoot Mr. Whittle in the head.
> Ms. Esposito said she made it clear to the officers that Mr. Whittle wasn't violent.

*Id.* (emphasis added).

12. In addition to Ms. Esposito, three witnesses stated that they heard the officers

yelling at Mr. Whittle to drop the knife:

> a. <u>Officer Yates</u> – "Officer Yates told Mr. whittle: "Drop it! Drop it!" but Mr. Whittle
>
>    did not comply." (OICI, p. 6)
>
> b. <u>J.L.</u> – "J.L said she heard the officers yell: "Put your hands up!" and "Put down the
>
>    knife!" several times." (OICI, p. 8)

c. <u>N.L.</u> – "N.L. said he heard the officers shout: "Put your hands up!  Put your hands up!  Put down the knife!  Put down the knife!" (OICI, p. 8)

13. In addition to Ms. Esposito, three witnesses stated that Mr. Whittle threatened to harm Ms. Esposito:

a. <u>Officer Yates</u> – "Officer Yates said he saw Mr. Whittle hold a knife to his mother's neck screaming: "I'm going to fucking kill her!" (OICI, p. 6)

b. <u>J.W.</u> – "J.W. said he looked out and saw two police officers confronting Mr. Whittle.  W.C. said he saw Mr. Whittle holding his mother "tightly" from behind. W.C. said it didn't look like Ms. Esposito was free to leave.  W.C. said he heard Mr. Whittle yell: "I'll kill her!"   W.C. said he saw a police officer shoot Mr. Whittle." (OICI, p. 9)

c. <u>M.R.</u> – "Protocol investigators interviewed witness M.R. who said he went outside and heard Mr. Whittle yelling: "I will not put down the knife, I will not put down the knife."   M.R. said he made sure his kids were safe and he saw Mr. Whittle forcefully walking Ms. Esposito.   M.R. said he saw Mr. Whittle holding Ms. Esposito by her shirt near her shoulder and possibly her neck.  Mr. R. Said it looked to him like Ms. Esposito was not moving according to her will.  M.R. said he heard Mr. Whittle yell: "I'm going to kill the bitch, I'm going to kill the bitch."  M.R. said he went inside his house because he recognized the possibility of "being in the line of imminent gunfire."  M.R. said within seconds of closing the door, he heard a single gunshot." (OICI, p. 9)

14. In addition to Ms. Esposito, three witnesses stated that Mr. Whittle did not drop the knife before he was shot:

    a.  <u>Officer Yates</u> – "Officer Yates told Mr. whittle: "Drop it! Drop it!" but Mr. Whittle did not comply." (OICI, p. 6)

    b.  *See* <u>J.W.</u> Statement, Fact #13

    c.  *See* <u>M.R.</u> Statement, Fact #13.

**STANDARD**

Rule 12(c) of the Federal Rules of Civil Procedure allows a defendant to move the Court to enter judgment on the pleadings. "[T]o survive judgment on the pleadings, Sanchez must allege 'a claim to relief that is plausible on its face.'" *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017) (citations omitted). "To determine whether the claim to relief is 'plausible on its face,' we examine the elements of the particular claim and review whether the plaintiff has pleaded 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (Citations omitted). "[The Court] accept[s] as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to [plaintiffs]." *Id.* (Citations omitted). "Though we construe factual allegations as true, we refuse to accept mere labels and legal conclusions as true." *Id.* (Citations omitted).

**ARGUMENT**

Plaintiffs have plead claims for excessive force under the Fourth Amendment, supervisory liability, and unconstitutional policies. Judgment should be entered in Defendants' favor on each of these claims for the reasons set forth below.

## I.    OFFICER BROADHEAD IS ENTITLED TO QUALIFIED IMMUNITY FOR HIS USE OF FORCE.

"When a defendant asserts a qualified immunity defense in a Fed.R.Civ.P. 12(c) motion, … 'we apply a heightened pleading standard, requiring the complaint to contain 'specific, non-

conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.' " *Ramirez v. Dept. of Corrections, Colo.*, 222 F.3d at 1241. "To overcome a defendant's claim of qualified immunity in the context of a Rule 12(c) motion, a plaintiff's pleadings must establish both that the defendant's actions violated a federal constitutional or statutory right and that the right violated was clearly established at the time of the defendant's actions." *Id.*

"A clearly established right is one that "is sufficiently clear that <u>every</u> reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (emphasis added). The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*, at 308 (citations omitted). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.*

### A. Officer Broadhead's use of deadly force did not violate the Constitution.

"To state an excessive force claim under the Fourth Amendment, [the Estate] must show both that a seizure occurred and that the seizure was unreasonable." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (citations omitted). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.* (Citations omitted). "Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (Citations omitted).

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (Citations omitted). "This is a 'totality of the circumstances' analysis." *Id.* (Citations omitted). "When considering 'the facts and circumstances of each particular case,' we specifically consider three factors outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989): (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.' *Id.* (Citations omitted). "The second *Graham* factor ... is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Id.* (Citations omitted). "This is particularly true in a deadly force case, because 'deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others.'" *Id.* (Citations omitted).

"Some of the factors we consider when evaluating the degree of a threat include, '(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Id.* (Citations omitted). "The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.* (Citations omitted).

An analysis of the *Graham* factors shows that Officer Broadhead did not violate the Fourth Amendment. First, Mr. Whittle was engaged in a severe crime – he was holding Ms. Esposito against her will with a knife. Second, Mr. Whittle posed an immediate threat to Ms. Esposito's life. When Officer Broadhead shot Mr. Whittle, he was using his mother as a shield. He was holding a knife that he had put to her throat at some point. Ms. Esposito told the Salt Lake County investigators that "The officers told Mr. Whittle to stop, and Mr. Whittle replied: 'I can hurt her! I can hurt her!'". This was confirmed by three other witnesses, who also told the investigators that Mr. Whittle used even more aggressive language in his defiance of the officers' orders. Thus, Ms. Esposito's life was in imminent danger. Finally, Mr. Whittle was actively evading arrest. As set forth above, he was using his mother as a shield, threatening to hurt her, and ignoring police orders to surrender. Each of the *Graham* factors confirm that Officer Broadhead was justified in using lethal force.

i.      **Officer Broadhead was not required to use a less restrictive means to end the threat to Ms. Esposito's life.**

Plaintiffs argue in their Complaint that Officer Broadhead could have potentially used a less restrictive means of eliminating the threat Mr. Whittle posed to his mother and the public. However, the Tenth Circuit has held, "The Fourth Amendment does not require officers to use the least restrictive means to investigate a threat. If officers act reasonably, it does not require them to do more." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1075 (10th Cir. 2010) (citations omitted). Thus, whether alternative means were available is irrelevant to whether Officer Broadhead violated the Constitution.

### ii.    A butter knife is a deadly weapon.

Plaintiffs also imply that the butter knife was not a deadly weapon.  This is not true.  The Tenth Circuit has noted that a butter knife can be used as a deadly weapon.  *See Craft v. Jones*, 2011 WL 3562943 (10th Cir. 2011) (unpublished).  *Craft* was a habeas petition stemming from a criminal case where "Craft was convicted on May 5, 2005, of assault and battery with a dangerous weapon for stabbing another man in the chest with a butter knife."  *Id.*, at *1.  Other courts across the country have also ruled that a butter knife is a deadly weapon.  *See Franklin v. Warden Louisiana State Penitentiary*, 2008 WL 5109742, * 3 (W.D. La. 2008) (unpublished) ("the state appellate court addressed at length the contention that the butter knife was not a dangerous weapon, which La.R. S. 14:2(3) defined as 'any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.'  The Court noted the victim's testimony that Petitioner put the knife to her neck, threatened to kill her, and used enough force to cause multiple bruises on the victim's body. The Court also cited a Louisiana decision in which a defendant had stabbed a victim to death using a butter knife, and another case where first degree murder was committed by stabbing a female victim to death with a fork and a butter knife."); *Haney v. Muniz*, 2020 WL 1988260 (C.D. Ca. 2020) (unpublished) ("On March 15, 2015, a Los Angeles County Superior Court jury found petitioner guilty of attempted voluntary manslaughter (a lesser included offense of the charged attempted murder) and assault with a deadly weapon after he stabbed Robert Williams in the neck with a butter knife, narrowly missing Williams's carotid artery.").  Thus, the butter knife Mr. Whittle held to Ms. Esposito's throat was a deadly weapon.  He could have easily stabbed her and killed her with it.

### B. There are no cases "clearly establishing" that Officer Broadhead's actions violated the Constitution.

Just 6 months before this incident, the United States Supreme Court ruled that it was not clearly established that an officer used excessive force when he shot a suspect who was holding a knife and standing 6 feet from the nearest person was an unconstitutional use of deadly force in *Kisela v. Hughes*, 138 S.Ct. 1148 (April 2, 2018). In *Kisela*,

> [Officer] Garcia spotted a woman, later identified as Sharon Chadwick, standing next to a car in the driveway of a nearby house. A chain-link fence with a locked gate separated Chadwick from the officers. The officers then saw another woman, Hughes, emerge from the house carrying a large knife at her side. Hughes matched the description of the woman who had been seen hacking a tree. Hughes walked toward Chadwick and stopped no more than six feet from her.

> All three officers drew their guns. At least twice they told Hughes to drop the knife. Viewing the record in the light most favorable to Hughes, Chadwick said "take it easy" to both Hughes and the officers. Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife. The top bar of the chain-link fence blocked Kisela's line of fire, so he dropped to the ground and shot Hughes four times through the fence.

*Id.*, 1151. Based on this, the Supreme Court held,

> Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick. Kisela had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down Kisela and Garcia. Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them. This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment.

*Id.*, at 1153.

The situation here was much more grave. While the suspect with the knife in *Kisela* was 6 feet away from the nearest person, Mr. Whittle was holding a knife to his mother's throat. If the

officer's conduct in *Kisela* did not amount to excessive force, it was not clearly established that Officer Broadhead's conduct under much more threatening circumstances amounted to excessive force, and qualified immunity must issue.

## II.     THE SUPERVISORS ARE ALSO ENTITLED TO QUALIFIED IMMUNITY.

"To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983 . . . [t]he plaintiff must show the defendant personally participated in the alleged violation." *Jenkins v. Wood*, 31 F.3d 988, 994 (10th Cir. 1996). "[P]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (citations and internal quotation marks omitted). A supervisor may be held liable for a subordinate's conduct "where the plaintiff has shown the supervisor himself 'breached a duty to plaintiff which was the proximate cause of the injury.'" *Id.* (*quoting McClelland v. Facteau*, 610 F.2d 693, 695 (10th Cir. 1979)). Nevertheless, "[t]o establish supervisor liability under § 1983, 'it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation.'" *Serna v. Colorado Department of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006). "[T]he supervisor must be personally 'involved in the constitutional violation,' and a 'sufficient causal connection' must exist between the supervisor and the constitutional violation." *Id.* (*quoting Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006)).

Judgment for the supervisors should issue for three reasons. First, Officer Broadhead did not violate the Fourth Amendment when he shot Mr. Whittle, as set forth above. Second, Plaintiffs have not alleged that Officer Adamson or Sheriff Rivera were personally involved in the incident at issue. Finally, even if Plaintiffs could overcome the above hurdles, Officer Adamson and Sheriff

Rivera would be entitled to qualified immunity because there are no cases clearly establishing that their own actions violated the Constitution. For these reasons, Officer Adamson and Sheriff Rivera are entitled to judgment on the pleadings.

### III.    UPD IS ENTITLED TO DISMISSAL UNDER *MONELL* AND ITS PROGENY.

Municipal entities are not liable under 42 U.S.C. § 1983 *solely* because their employees inflict injury on a plaintiff. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). To establish liability, a plaintiff must show that "a policy or custom exists and that there is a direct causal link between the policy or custom and the injury alleged. [A plaintiff] cannot state a claim for relief against [a municipality] under § 1983 merely by pointing to isolated incidents." 2011 WL 1134313, at *3 (D. Colo. Mar. 28, 2011), *aff'd*, 428 F. App'x 869 (10th Cir. 2011). Where a plaintiff has failed to include "any allegations that demonstrate a link between a policy or custom of the [municipality] and the injuries he alleges. . . . he cannot maintain a claim for relief against [the municipality]." *Id.* Where allegations are no more than a recitation of the elements, the claim is insufficient. *See Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir.2007) ("the plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action" (internal citation omitted)).

Plaintiffs' claims against UPD fail because there was no constitutional violation, as set forth above. Moreover, even if the Court finds there are sufficient facts alleged to constitute a violation, Plaintiffs have not alleged any facts suggesting that it was caused by a UPD policy or custom. In fact, Plaintiffs have not identified any specific UPD policy that they believe caused the use of force. Therefore, this claim also fails.

# IV.     PLAINTIFFS' CLAIM FOR UNCONSTITUTIONAL POLICY FAILS.

Plaintiffs' final claim is entitled "Unlawful and Deficient Policies, Procedures, and/or Protocols." *See Id.*, Par. 87-96.  In this claim, Plaintiffs allege that UPD violated the Constitution by failing failed to enact policies to deal with this situation.   A review of these allegations demonstrates that they do not state a claim for relief.  For example, Plaintiffs allege "UPD had an ongoing obligation to train and monitor Defendant Broadhead as to how to interact with non-compliant or disorderly individuals without resorting to deadly force." *Id.*, Par. 89.  However, this allegation is directly contradicted by Supreme Court and Tenth Circuit case law allowing the use of deadly force in appropriate circumstances.  As set forth above, the use of deadly force was proper here because Mr. Whittle had taken his mother hostage and was holding a knife to her throat, and according to his mother's statement to the investigating officers:

> Ms. Esposito explained that when Mr. Whittle saw the police officers, he grabbed onto her.  The officers told Mr. Whittle to stop, and Mr. Whittle replied: "I can hurt her! I can hurt her!"  Ms. Esposito said that Mr. Whittle was holding her from behind and had a butter knife in his hand.

OICI, Exhibit A.

Plaintiffs further allege that Defendants "failed to create, adopt, promulgate, implement, enforce, revise and/or update lawful policies and procedures, and/or protocols regarding the use of force with a firearm, specifically about when such force is permitted by law, and when it is not permitted."   Dkt. #2, Par. 93.   These allegations hinge on whether the use of force was constitutional.  The statements by the witnesses and relevant case law regarding hostages and knives make it clear that the use of deadly force did not violate the Constitution.  Because there

was no Constitutional violation, Plaintiffs' claim that UPD's policies were constitutionally deficient fails.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court enter judgment in their favor pursuant to Fed. R. Civ. P. 12(c).

DATED this 1st day of February, 2021.

SNOW CHRISTENSEN & MARTINEAU


 /s/ Scott Young
Andrew M. Morse
Scott Young
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of February, 2021, I electronically filed the foregoing **DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record, as follows:

> Robert B. Sykes
> C. Peter Sorenson
> SYKES MCALLISTER LAW OFFICES, PLLC
> 311 S. State Street, Suite 240
> SLC, UT 84111
> *Attorney for Plaintiff*

_____/s/   Kathy Pickett_____

4840-1880-8196, v. 1